Monell, Ch. J.
The space occupied by the plaintiffs for their bathing h ouse, under a “ permit, ” or license from the commissioners of the department of docks, is a part of the navigable waters of the Bast river. It lies below the low-water mark, and partly in the channel of the stream, and is used wholly for private emolument.
Such a use of a public navigable river would be a purpresture or public nuisance, unless authorized by law.
Section 99 of the act to reorganize the local government of the city of New York, as amended in 1871, declares that the department of docks shall have exclusive charge and control .... of all the wharf property belonging to the city, including all the wharves, piers, bulkheads and structures thereon, and waters adjacent thereto, and all the slips, basins, docks, water fronts, land under water, and the appurtenances, easements, uses, reversions and rights belonging thereto, which are now owned or possessed by the corporation. Such ■department also has the exclusive charge and control of the repairing, maintaining, leasing and protecting the *66 property ; and is invested with the exclusive government and regulation of ad wharves, piers, bulkheads and structures thereon, and waters adjacent thereto, and all the basins, slips and docks with the land under water in said city, not owned by the corporation.
Under this most comprehensive and clearly defined authority in the dock commissioners, over the dock property of the city, which extends, as will be seen, over the slips, basins and adjacent waters, and includes as well, property owned and not owned by the city, the power of the commissioners, to grant leases and franchises, and to permit private uses of such slips, basins and adjacent waters, where such use does not essentially interfere with or obstruct the public use, cannot well be questioned.
All navigable streams belong to the public, and the State can not grant them to any private use that will impair the public use. Congress, under its authority to regulate commerce, may in furtherance of commerce, restrict, in some degree, the public use of navigable waters (State of Penh. v. Wheeling, &c. Bridge Co., 18 How. Pr. 421). But no such authority is reserved to the States (Gilman v. Philadelphia, 3 Wall. 713). A grant of a monopoly of the Hudson river, given to Robert R. Livingston, in 1798, was declared by the supreme court of the United States, to have been unconstitutional, as infringing the exclusive power of congress to regulate commerce (Gibbons v. Ogden, 9 Wheat. 1).
The authority of that case has since been uniformly recognized and followed; and grants by the State have been confined to such uses only, as do not impede the public use. Hence, in grants for the erection of bridges or other structures over or in navigable streams or waters, provision must be made for their construction in such manner, as not essentially to obstruct the common free navigation by the public *67 (People v. Saratoga & Rens. R. R. Co., 15 Wend. 113 ; Penn. v. Wheeling, &c. Bridge Co., 13 How. Pr. 518 ; Columbus Ins. Co. v. Peoria Bridge Co., 6 McLean, 70.)
The act of the legislature creating the department of docks is valid, if no grant is made under it which will obstruct commerce. The commissioners may regulate the use of the basins and slips, and may permit them to be used for private purposes, provided such use does not essentially impair the public use. There are no riparian rights to adjacent waters, and the public can complain only when its use is obstructed.
In Lansing v. Smith (4 Wend. 1), involving the Albany pier question, the chancellor says,( p. 21) “there can be no doubt of the right of the legislature to make grants, when they do not interfere with the vested rights of individuals. The right to navigate public waters of the State and to fish therein . . . are public rights, and not the private unalienable rights of each individual.”
But should the department grant the exclusive private use of slips or basins to a degree that would essentially interfere with the rights of the public; it would be a purpresture and indictable as a public nuisance (People v. Vanderbilt, 26 N. Y. 287; 28 Id. 396).
But within the restrictions mentioned the department, under the power to regulate the use of slips and basins, may lawfully permit their use for a private purpose. In one case (Hecker v. Balance Dock, 24 Wend. 215), the court even held that the corporation might direct the use of any particular slip to be appropriated exclusively to any particular craft or class of vessels.
Without, however, concurring in this perhaps extreme view, it is sufficient, if the appropriation to a private use, does not essentially interfere with the use for commerce.
*68 The test, therefore, of a legislative grant of power over navigable waters, is whether it allows of any essential interference with the public use, and that is always a question of fact to be disposed of in the manner such questions are usually determined. If there is no such interference or obstruction of the public use, then a legislative grant of a private use is neither a purpresture nor a public nuisance.
Independently of this general principle, applicable to all navigable streams, the right and authority of the corporation to and over the wharves, piers, slips and basins, granted first by the ancient charters (Montgomerie, § 38), and since recognized and continued in all subsequent legislation, extends the jurisdiction of the city, over much of the adjacent waters, which at the present day reaches at least to the pier or bulkhead line (People v. Vanderbilt, 26 N. Y. 287).
It has not, I think, been doubted at any time, that within the space thus granted, the corporation has the most ample power to occupy and use it, and, as an incident or appurtenant, to grant to others the right to occupy and use it, to any extent that does not, at least, obstruct the free navigation of the river. The construction of piers, slips and basins are as essential to commerce as the water itself, and that which is so essential to commerce, can hardly be said to obstruct it.
The proofs presented upon this motion fail to satisfy me that the small space occupied by the plaintiff’s bath house can cause any material interference with, or obstruction of, the free and common use of the river by the public. Of course while such space is occupied it can not be used by others, and so far, it may be said, to obstruct the public use. But so it may be said of a bridge with its draw closed. If, however, it is provided with a sufficient draw, it is a lawful structure, notwithstanding it may, at times and to some extent, *69 interrupt the public use of the stream (Renwick v. Moore, 3 Hill, 621).
Nevertheless, such use of the slip would constitute it a public.nuisance, if it were not sanctioned by the commissioners’ license. No person, without a grant, can permanently moor a floating structure in a public river. It would per se be a public nuisance (Hart v. Mayor, &c. of Albany, 9 Wend. 571.)
But assuming, as I must, that the grant or license to the plaintiffs is of a portion of the waters not needed for navigation or commerce (except perhaps in exceptional cases) or, in other words, a grant that does not and will not, essentially, interrupt or obstruct the free and common navigation of the river, it must follow, that the plaintiffs are lawfully in possession of the space they occupy, and can not be dispossessed, or disturbed in such possession, unless the grant or license from the dock commissioners is subject to a higher power lodged in the captain of the port and harbor masters.
That question I will now examine.
The powers of the last named officers are derived from acts of the legislature passed in 1862 and 1867.
The act of 1862 provides, in section 7, “ Each harbor master shall have power, within the district assigned to him to provide and assign suitable accommodations for all ships and vessels, and regulate them in the stations they are to occupy at the wharves or in the stream, and to remove from time to time such vessels, as are not employed in receiving or discharging'their cargoes, to make room for such others as require to be more immediately accommodated for the purpose of receiving or discharging their cargoes.”
The distinctive duty of the captain of the port is of a supervisory nature. He may make rules and regulations, and give directions in aid and for the government of the harbor masters ; but the power of all such *70 officers is derived chiefly, if not wholly from the act of 1862.
Under that act, it is claimed, not only that the harbor masters have the exclusive control over the slips and basins and other navigable parts of the river, but that they are the ultimate arbiters of the manner in, and purpose for which, they may be used.
If a power so comprehensive could be claimed for the harbor masters, there would be a manifest inconsistency in the provisions of the statutes ; and as the city claim under the last statute (act of 1871), it would lead to the conclusion that the legislature intended to repeal the former. The saving clause, however, is found in the act of 1871, namely, that the powers and duties therein conferred upon the dock commissioners, shall not affect the powers of the harbor masters as now defined by law.
The powers and duties of the several officials are wholly distinct and separate. Those of the dock commissioners, I have already defined.
The duties of the harbor masters are of a conservative nature, and are only, but indispensably, necessary wherever an extensive commerce is carried on. Without some power of control over the arrival and departure of vessels, and their moorage when in port, disorder and confusion would be the consequence. To regulate this, and to prevent disorder, these officials are clothed by the legislature with a constabulary or police power, and made quasi conservators of the peace.
They are, however, officers of limited jurisdiction, and can exercise such powers only as are expressly given, or which can necessarily be implied from such as are expressly given.
Such express powers, as defined by the statutes, are, to provide and assign suitable accommodations for ships and vessels, and to remove such as are not employed in receiving or discharging cargo, and to make *71 room for such others, as require to be more immediately-accommodated for the purpose of receiving or discharging cargo. The object of all this, is to prevent over ■ crowding, confusion and disorder, and to secure just and equal right in the use of the harbor.
To tliis extent the harbor masters have jurisdiction. They may regulate the time and manner that ships and vessels shall occupy slips and basins for purposes of commerce, and determine between the conflicting claims of vessels, and as to their respective rights and priorities to discharge or receive their cargoes.
These duties do not at all conflict with the powers of the dock commissioners, and the two can move along in entire harmony.
The harbor masters have a large discretion in assigning the use of the slips to vessels, and in determining the time and manner of using. But it is not an absolute or arbitrary power, which may be exerted without regard to the exigencies of the time and place. Like all discretionary powers, it must have a foundation of propriety or necessity to rest upon.
While they may lawfully prevent disorder and confusion, and, in the language of the act, remove such vessels as are not employed in receiving or discharging cargo, I can not concede to them the right to make such removal, except for the purpose, also specified in the act, of making room for such others as require to be more immediately accommodated for the purpose of receiving or discharging their cargoes.
In the case of Adams v. Farmer (1 E. D. Smith, 588), the common pleas held, that as the power was general, it was not limited to cases where other vessels required to be immediately accommodated in receiving or discharging cargo. But that decision can not be reconciled with other decisions defining the extent of discretionary powers.
In Vanderbilt v. Adams (7 Cow. 349), the harbor *72 piaster had ordered the Thistle, lying at a wharf on the ¡North river, to move a certain distance in order to give a berth to an other vessel called the Legislator. The court say, “it will be observed that no question is-raised as to the right of the steamboat Legislator to be at this wharf, had there been no other vessel occupying-it. The ground of the defense is, that the law conferred no authority to interfere at all. The owner of the Thistle-having the exclusive right of deciding whether to-remove or not, in order to give place to another vessel. The right assumed {by the harbor masters) under the law would not be upheld, if exerted beyond what may be considered a necessary police regulation.”
The board of health is supposed to be invested with large discretionary powers; and by statute, was required to cause all putrid or unsound meat, dead animals, &c., found in any street or other place, to be forthwith removed beyond the limits of the city. Under that statute, this court held, in an action against an inspector for removing dead hogs (Underwood v. Greer, 3 Robt. 86), that the discretion, and therefore the judgment, of the officials, was absolute, and he was not responsible for any error of judgment. But the court of appeals, reversing this court (42 N. Y. 140), held otherwise. That while it was conceded that the officer in the discharge of his duties is clothed with a judicial discretion, yet he is an officer of a limited and special jurisdiction, and when in any given case his power is challenged, he must prove some facts invoking or tending to invoke the exercise of his discretion.
The general railroad act was supposed to confide-absolutely to the directors the right to determine what lands were required for the purposes of the road. But in Rensselaer & Saratoga R. R. Co. v. Davis (43 N. Y. 137), the court held, that the determination of the directors was conclusive, and that the court is to decide *73 upon the application, the question as to the necessity and extent of the appropriation.
The proposition to be deduced from these cases is that when a power of any kind is to be exercised, it must have, to uphold and justify its exercise, the support of sufficient facts.
Under this view of the case, before the harbor master can direct the removal of a ship or vessel, there must appear to be some necessity for xit., It is not enough, in the language of one of the defendants, that he knows of no other place for the landing of certain merchandise. It must be shown that the place is, not may be, needed for some purpose connected with navigation or commerce. And until such necessity arises, the officer is powerless to lawfully interfere.
In entrenching, as it may with some plausibility be claimed, upon the vested rights of the city, the legislature must be understood to have intended nothing more than is clearly expressed by the statute ; and, therefore to have merely invested the harbor masters with certain prescribed police powers and duties, in no way interfering with the proprietership of the city. If it is successfully claimed to be otherwise, then the act would be open to the constitutional objection of taking vested rights without compensation.
But without pursuing the subject further, I am of opinion, that if the space occupied by the bath house is not needed for commerce, and the occupancy of it does not essentially interfere with the free and common use of the river for navigation, the permission to use it was within the power of the State to- grant. That such grant was made to the department of docks, and its written permission to the plaintiffs gave them a lawful possession, of which they can be deprived only, by its being established, either, that it is an essential interference with navigation, or that a necessity exists'for its immediate use for the purposes of commerce.
*74 The facts upon which, this case, under the view which I have taken, must turn, namely, whether there is such an interference or obstruction of navigation, as would render the grant void ; or whether some immediate requirement or necesssify of commerce exists, to justify the interference of the harbor master, are questions of fact and must be determined before the appropriate judgment can be pronounced.
It results from these views, that the plaintiffs are in lawful possession, and can not be disturbed, until it appears, that the space they occupy obstructs the public use, or is needed for purposes of commerce.
As the case now stands, I am justified in retaining the injunction until the trial.